Argued and submitted September 26, 2022, appeal dismissed as moot
April 19, 2023

James R. HARGREAVES,
in behalf of Angelica Cece Maki,
Ruth Diane Lewis, Charles Edward Evans,
Marissa Pugh, and Anthony Carey,
*Plaintiff-Appellant,*

*v.*

Dolores MATTEUCCI,
in her official capacity as
Superintendent of the Oregon State Hospital,
*Defendant-Respondent.*

Marion County Circuit Court
21CV11744; A177515

528 P3d 1180

Plaintiff, a retired circuit court judge and former Governor's Special Master for the Oregon State Hospital (OSH), petitioned for a writ of habeas corpus on behalf of five OSH patients. Plaintiff had no relationship with those patients and did not purport to be acting with their authorization, knowledge, or consent; rather, he "volunteered" to bring this action on behalf of those patients under ORS 34.340. That statute permits a court to issue a writ of habeas corpus upon a petition of "some other person in behalf of" the party detained. The trial court dismissed the case because plaintiff lacked standing. Plaintiff appeals. *Held*: In reviewing the statute's text and historical context, the Court of Appeals concluded that plaintiff lacked standing to act in behalf of the patients under ORS 34.340. Because plaintiff lacked standing, this case did not meet the requirements of ORS 14.175, which permitted a court to review a case that was moot but capable of repetition yet evading review when plaintiff had standing.

Appeal dismissed as moot.

Courtland Geyer, Judge.

George W. Kelly argued the cause and filed the briefs for appellant.

Jon Zunkel-deCoursey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.*

JOYCE, J.

Appeal dismissed as moot.

_____

  \* Jacquot, J., *vice* James, J. pro tempore.

## JOYCE, J.

ORS 34.340 permits a court to issue a writ of habeas corpus upon a petition of the party for whose relief it is intended, "or of some other person in behalf of the party[.]" In this case, plaintiff, a retired circuit court judge and former Governor's Special Master for the Oregon State Hospital (OSH), petitioned for a writ of habeas corpus on behalf of five OSH patients. Plaintiff had no relationship with those patients and did not purport to be acting with their authorization, knowledge, or consent; rather, he "volunteered" to bring the action. The trial court dismissed the case because plaintiff lacked standing. Plaintiff appeals. In his view, we should construe ORS 34.340 to allow a petition for writ of habeas corpus to be filed "by any human being on the planet, without regard to whether the filer acts with the [benefitted] party's approval or knowledge." We disagree that ORS 34.340 is that broad and ultimately agree with the trial court that plaintiff does not have standing. Because plaintiff lacks standing, this case does not meet the requirements of ORS 14.175, which permits a court to review a case that is moot but capable of repetition yet evading review if plaintiff has standing. Accordingly, we dismiss the appeal as moot.

## I. FACTS

The facts relevant to this appeal are few and undisputed. A municipal court committed five patients to OSH during their respective criminal proceedings after it determined that the patients were unable to aid and assist in their own defense. Each patient was represented by counsel in their criminal cases.

Plaintiff filed a habeas corpus petition on behalf of the patients against defendant, the superintendent of OSH, alleging that because those patients were mentally ill and unable to protect their own rights, he "volunteered to bring this proceeding" to free those patients from unlawful restraint.[1] In plaintiff's view, the commitments were unlawful because the municipal courts lacked jurisdiction to

---

[1] By the time the superintendent filed her return, two of the patients were no longer in OSH's custody.

commit those patients under ORS 161.370 and OSH lacked authority to accept, detain, or treat patients whose most serious offense is one defined by municipal ordinance. OSH moved to dismiss the action on several bases, the relevant one for purposes of this appeal being that plaintiff lacked standing. The trial court deferred ruling on that question.

OSH later moved to dismiss because in its view, the case had become moot because each of the individuals on whose behalf plaintiff purported to act had been released. The court denied that motion, concluding that "other individuals could be illegally detained in the same fashion as alleged in this case[.]"[2] The court then explained, however, that the mootness question "renews focus on whether Plaintiff is acting in behalf of the named individuals[.]"

The trial court ultimately concluded that plaintiff did not have standing and entered a judgment dismissing the case. Plaintiff appeals, challenging that ruling.

## II.   ANALYSIS

On appeal, plaintiff continues to assert that he has standing to bring the petitions for writ of habeas corpus. Before addressing that issue, we first address the question whether this case is moot. Both parties agree that it is but that we should nonetheless review it because it is capable of repetition yet evading review. ORS 14.175.

We agree with the parties that the case is moot. Each of the individuals has been released and plaintiff has not identified any collateral consequences stemming from the judgment. *State v. K. J. B.*, 362 Or 777, 785, 416 P3d 291 (2018) (a case is moot when, considering both direct and collateral consequences, a decision "will no longer have a practical effect on the rights of the parties" (internal quotation marks omitted)).

Because the case is moot, we next consider whether we will exercise our discretion to review it. ORS 14.175

---

[2] We understand this statement to be a reference to one of the factors in ORS 14.175, which allows a court to review an otherwise moot case if it is capable of repetition yet evading review. *See* ORS 14.175(2) (one of the three factors is whether the "act challenged by the party is capable of repetition, or the policy or practice challenged by the party continues in effect").

permits a court to issue a judgment in a moot case if the court determines that three factors are met:

> "(1)   The party had standing to commence the action;

> "(2)   The act challenged by the party is capable of repetition, or the policy or practice challenged by the party continues in effect; and

> "(3)   The challenged policy or practice, or similar acts, are likely to evade judicial review in the future."

As noted above, the trial court declined to dismiss the case as moot because other individuals could be detained in the same fashion, seemingly alluding to subsection (2). It then went on to observe that the motion to dismiss as moot renewed focus on the question whether plaintiff had standing, an issue that the court had previously deferred ruling on. The court later dismissed the case because it concluded that plaintiff did not have standing, although it did so without reference to ORS 14.175(1). As we explain below, we agree with the trial court's ultimate conclusion that plaintiff did not have standing, although we do so in the analytical framework of ORS 14.175(1).

We turn now to the statute that governs the filing and allowance of a petition for habeas corpus. ORS 34.340 circumscribes, in somewhat broad and nonspecific terms, who may file a petition:

> "The writ shall be allowed by the court or judge thereof upon the petition of the party for whose relief it is intended, *or of some other person in behalf of the party*, signed and verified by the oath of the plaintiff, to the effect that the plaintiff believes it to be true."

(Emphasis added.) Plaintiff here asserts that he is "some other person" who is allowed to voluntarily bring this habeas corpus action "in behalf of" the patients under ORS 34.340. OSH, on the other hand, argues that the plain text of the terms "in behalf of" requires "a plaintiff bringing a habeas corpus action to have a relationship with the real party in interest."

The parties' dispute thus presents a question of statutory construction that we resolve by considering the text, context, and any helpful legislative history. *State v. Gaines*,

346 Or 160, 171-72, 206 P3d 1042 (2009). We first turn to the text. Because the legislature did not define "in behalf of," we "assume that the legislature intended the words in the statute to have their plain and ordinary meanings." *State v. Clemente-Perez*, 357 Or 745, 763, 359 P3d 232 (2015).

The legislature enacted the original version of ORS 34.340 in 1862, and the text in dispute in this case has not changed since that original enactment. *See* General Laws of Oregon, Civ Code, ch VII, § 599, p 234 (Deady & Lane 1843-1872) ("The writ shall be allowed by the court or judge thereof, upon the petition of the party for whose relief it is intended, or by some other person in his behalf[.]").[3] Thus, to try and understand the meaning of "in behalf of," we rely on dictionaries that were in use around the time of the legislature's enactment. *See Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296 n 7, 337 P3d 768 (2014) ("it is important to use sources contemporaneous with the enactment of the statute" when consulting dictionaries).

The term "behalf" had a broad definition, including "[f]avor; advantage; convenience; profit; support; defense; vindication." Noah Webster, 1 *An American Dictionary of the English Language* (unpaginated) (1828) (reprint 1857). The dictionary provided examples of what the term means and, in fact, did so by way of using the phrase at issue here, "in behalf of": "[T]he advocate pleads in *behalf* of the prisoner; the patriot suffers in *behalf* of his country." *Id.* (italics in original). By way of additional definition, "behalf" also meant "[p]art; side; noting substitution, or the act of taking the part of another; as, the agent appeared in *behalf* of his constituents, and entered a claim." *Id.* (italics in original).

Some, but not all, of the examples of what "in behalf of" meant appear to connote some kind of relationship between the person taking action in behalf of someone else.

---

[3] Oregon guaranteed habeas corpus protection from the beginning of statehood. *See Penrod/Brown v. Cupp*, 283 Or 21, 24, 581 P2d 934 (1978) (tracing historical development of habeas corpus in Oregon). In 1862, the legislature passed the statutory provision, that "[e]very person imprisoned or otherwise restrained of his liberty, within this state, * * * may prosecute a writ of habeas corpus according to the provisions of this title, to inquire into the cause of such imprisonment or restraint, and if illegal, to be delivered therefrom." General Laws of Oregon, Civ Code, ch VII, § 597, p 233 (Deady & Lane 1843-1872), *codified as* ORS 34.310.

But beyond that, the broad definition tells us little about whether ORS 34.340 contains limits on who has standing to file a habeas corpus petition.

Because the statute itself offers little help in discerning how the legislature, 150 years ago, understood the phrase "in behalf of," we examine the "historical context of its adoption for possible evidence of a settled understanding of the term." *Couey v. Atkins*, 357 Or 460, 492-93, 355 P3d 866 (2015); *see also State v. Pipkin*, 354 Or 513, 526, 316 P3d 255 (2013) ("[W]e do not interpret text in isolation; we also consider the historical context against which that text was enacted."). The historical context for interpreting a statute's text includes "the preexisting common law and the statutory framework within which the law was enacted." *State v. Ofodrinwa*, 353 Or 507, 512, 300 P3d 154 (2013) (internal quotation marks omitted). As we explain, the historical context of the habeas corpus statute is particularly helpful in guiding our resolution because Oregon's habeas corpus statute is hardly an anomaly. To the contrary, the writ of habeas corpus dates back to early England (if not earlier) and was prevalent in colonial America. In fact, many of the early statutes codifying the writ of habeas corpus contain language nearly identical to ORS 34.340. We thus turn to that context.[4]

A.    *Habeas Corpus's English Origins*

The writ of habeas corpus has expanded, over time, in scope and meaning. In its earliest form, dating back to at least thirteenth century England, the writ simply operated as a kind of subpoena—its purpose was to bring people before the court because their presence was necessary. H. P. Letcher, *The History of the Writ of Habeas Corpus*, 14 Bell Yard: Journal of the Law Society's School of Law 4, 5 (1934). Over time, it evolved to become a substantive remedy that provides people an avenue to challenge unlawful detention. *Id.* at 6. *See, e.g.*, *Boumediene v. Bush*, 553 US 723, 741, 128 S Ct 2229, 171 L Ed 2d 41 (2008) (referencing "Darnel's case," 3 How St Tr 1 (KB 1627), where five knights were imprisoned for not contributing to a loan the king had

_____

[4] We are unable to find any relevant legislative history from ORS 34.340's enactment in 1862.

demanded; they petitioned the court for a writ of habeas corpus, challenging their imprisonment).

As to the question of what we now refer to as "standing" to file a petition for a writ of habeas corpus, the Habeas Corpus Act of 1679 appears to be the earliest example of a statute that attempted to expressly delineate who was permitted to file a petition for writ of habeas corpus. That Act authorized an application to be made by the party detained, "or any one on \*\*\* their behalf." 31 Charles 2 ch 2, § 2. Shortly after its enactment, in 1704, the House of Lords resolved that "every Englishman, who is imprisoned by any authority whatsoever, has an undoubted right, *by his agents, or friends*, to apply for, and obtain a Writ of Habeas Corpus, in order to procure his liberty by due course of law." *Whitmore v. Arkansas*, 495 US 149, 162, 110 S Ct 1717, 109 L Ed 2d 135 (1990) (quoting *Ashby v. White*, 14 How St Tr 695, 814 (QB 1704) (emphasis added)).

Cases decided after the enactment of the Habeas Corpus Act and the House of Lords resolution reflect that courts allowed third parties—such as family members or agents—to file petitions for writs of habeas corpus where they demonstrated certain established relationships with the person on whose behalf the petition was filed. The most common examples include a parent filing a petition for writ of habeas corpus on behalf of a child for purpose of obtaining custody, *e.g.*, *In re Ann Lloyd*, 3 Man & G 547, 133 Eng Rep 1259 (1841), or a spouse petitioning on behalf of their partner, *e.g.*, *Benns v. Mosley*, 2 CB 116, 140 Eng Rep 356 (1857).

But in the absence of any apparent relationship between the person filing the petition and the person on whose behalf relief was sought, courts required the petitioner to show some legal right or authority from the person detained before accepting third-party petitions for writ of habeas corpus. For example, in 1762, the Court of King's Bench denied a habeas petition filed by an individual who "desired a rule for liberty to have access to and inspection of [the detained person, who was mentally ill], in order to see that she was properly treated." *Rex v. Clarke*, 3 Burr 1362, 1363, 97 Eng Rep 875, 876 (KB 1762). The court explained that because the third-party petitioner could not

show that "his application was made *on behalf of* any person who had the least pretension to demand this," such request would not be listened to. *Id.* (Emphasis added.) Similarly, in *Ex parte Child*, 15 CB 238, 139 Eng Rep 413 (1854), the Court of Common Pleas discharged a habeas corpus action brought on behalf of a person who was mentally ill, where the record was devoid of any evidence that "the party promoting the application was duly authorized by" the person confined. *Id.* at 238. The court concluded that "[a] mere stranger has no right to come to the court and ask that a party who makes no affidavit, and who is not suggested to be so coerced or to be incapable of making one" to be discharged from restraint. *Id.* at 239.

In sum, early English law reflected some principled limitations as to who could bring a petition; if the record was devoid of evidence of a relationship between the petitioner and the person unlawfully detained or some evidence that the petitioner was acting with authority, a court would not allow the petitioner to move forward with the writ of habeas corpus.

B.   *Third-party Habeas Petition in Colonial America*

Habeas corpus quickly took root in Colonial America, "principally through tradition and the common law." Dallin H. Oaks, *Habeas Corpus in the States—1776-1865*, 32 U Chi L Rev 243, 247 (1965); *see also* A.H. Carpenter, *Habeas Corpus in the Colonies*, 8 Am Hist Rev 18, 22 (1902) (colonial courts entertained writs of habeas corpus as early as one hundred years before the United States Constitution). Except for Connecticut, each of the 13 original American colonies closely patterned their habeas corpus statutes after the English Habeas Corpus Act of 1679. Oaks, 32 U Chi L Rev at 253. Among the original colonies, some states adopted the language of the English Habeas Corpus Act that someone can act "on behalf" of others. *See, e.g.*, 1787, NY Laws 1785-88, 425. Other states, like Massachusetts, used the term "in [their] behalf[.]" Mass Gen Laws, ch 72 (1784). We do not understand that distinction to be a significant one, because in 19th century American English, the two phrases were often used interchangeably in dictionaries. *See* Joseph E. Worcester, *Dictionary of the English*

*Language* 129 (1859) (using both "in the behalf of" and "on the behalf of" interchangeably in providing example sentences of the word "behalf"); *The Oxford English Dictionary* 771 (1st ed 1933) (providing examples of how "on behalf" was used in sentences in the 19th century and noting that *on behalf* was used interchangeably with *in behalf* when the phrase means "in the interest of," "as a friend or defender of" or "for the benefit of").[5]

   Consistent with English common law, early American courts' decisions limited who was allowed to file a petition for writ of habeas corpus.[6] As did English courts, American courts continued to recognize a habeas petition filed by a third party who demonstrated a sufficient relationship with the person detained. For example, in *People ex rel Barry v. Mercein*, 3 Hill 399 (NY Sup Ct 1842), the New York supreme court confirmed a parent's "common law" right to apply for a writ of habeas corpus to obtain custody of a minor child where the child was alleged to be illegally detained. *See also Nickols v. Giles*, 2 Root 461 (Conn Super Ct 1796) (considering father's habeas petition on behalf of his three-year-old daughter); *In re Ferguson*, 9 Johns 239 (NY Sup Ct 1812) (allowing father to seek a writ of habeas corpus on behalf of his son in seeking his release from the army); *State v. Clover*, 16 N.J.L. 419 (NJ Sup Ct 1838) (mother sought habeas corpus relief for the custody of her minor child). Yet another common example—reflective of our country's racist history of allowing landowning white men to hold slaves—involved courts permitting slave owners to file a writ of habeas corpus to reclaim slaves.

---

[5] Indeed, even in modern times, although there is some grammatical debate about whether "in behalf of" means something different than "on behalf of," *Webster's Third New Int'l Dictionary* 198 (unabridged ed 1993) defines "in behalf of or on behalf of" collectively as "in the interest of," "as the representative of," or "for the benefit of." It goes on to explain in the usage guide that although the distinction between *in* behalf of and *on* behalf of "has been observed by some writers overall [it] has *never* had a sound basis in actual usage" and the distinction in American English is "frequently not observed." (Emphases added.)

[6] While the writ of habeas corpus is not new, the way in which we—and other states—parse statutory language, comparatively speaking, is new. We make that point here because there are few, if any, instances of any court engaging in the analysis that we are required to do here. Instead, courts created lines of demarcation of who could and could not petition for writs of habeas corpus without linking those lines to statutory text.

*E.g.*, *Ex parte Toney*, 11 Mo 661 (1848) (a slave owner filed a habeas petition for the release of a slave).

Conversely, courts did not permit petitions from someone who neither had any significant relationship with the person detained nor was acting under authorized representation or consent from that person. For instance, in *U.S. ex rel Wheeler v. Williamson*, 28 F Cas 686, 694 (ED Pa 1855), a court refused a petition for a writ of habeas corpus because the applicant was "a stranger" to the case and the person for whom relief was sought had not "sanctioned" the application. The court explained that "our records cannot be opened to every stranger who volunteers to us a suggestion, as to what may have been our errors, and how we may repair them." *Id.* The court observed that "the writ of habeas corpus can only be invoked by the party who is restrained of liberty, or by some one in his behalf." *Id.* The court further observed that that practice was consistent with English practice, inasmuch as English courts also "sternly exacted proof, that the application was authorized by the aggrieved party, before permitting the writ to issue." *Id.*

Indeed, at least one court went so far as to conclude that a person could be sued for filing a petition for writ of habeas corpus in the absence of such authority. In *Linda v. Hudson*, 55 Mass (1 Cush) 385 (1848), the court considered whether a person could be liable for bringing a habeas corpus petition, though purportedly made "in the plaintiff's behalf," without authority from that person. The court held that a petitioner bringing up a person on habeas corpus without that person's request or authority, may be sued in an action on the case by the person thus brought up. *Id.* at 388.

The United States Supreme Court also explored the common law limitations of a third-party habeas corpus petition. In *Ex parte Dorr*, 44 US (3 How) 103, 11 L Ed 514 (1845), the Court rejected the idea that an attorney "without the authority of the party concerned" could petition for a writ of habeas corpus. *Id.* at 104. In *Dorr*, the court had to determine whether, under the Judiciary Act of 1789, it could issue a writ of habeas corpus brought by an attorney

challenging a defendant's conviction for treason.[7] The attorney who filed the writ was not the defendant's attorney, and according to affidavits filed in support of the writ, personal access to the defendant to determine whether he wanted to pursue a remedy had been refused. *Id.* Relying in part on early English common law, including the decision in *Ex parte Child*, 139 Eng Rep at 413, the Court denied the petition. *Id.* at 106. In doing so, the court—invoking the common "in behalf of" language—observed that "[m]ere volunteers, who do not appear in behalf of the prisoner or show some right to represent him, will not be listened to." *Id.* at 103 n 2. The court thus concluded that it had "no such power under the common law" to issue a writ brought by someone other than the prisoner or someone "under his authority." *Id.* at 105. The court also cited *Linda*, 55 Mass (1 Cush) at 385, noting that a person "bringing up a person on *habeas corpus* without his request or authority, may be sued in an action on the case by the person thus brought up." *Id.* at 103 n 2 (italics in original).

In short, the early American development of habeas corpus, and the limitations on who could bring such actions, paralleled English common law: Courts did not permit a stranger, acting without authority from the person on or in whose behalf the writ was sought, to bring such an action.

C.  *Development of Habeas Corpus in Oregon*

It was against that legal and historical landscape that the Oregon Legislative Assembly enacted our state's habeas corpus statute in 1862. Like many states, Oregon patterned its habeas corpus statute after the English Corpus Act of 1679. Oregon's first habeas statute required habeas petitions to be filed by "the party for whose relief it is intended," or "some other person" to act "in [their] behalf." General Laws of Oregon, Civ Code, ch VII, § 599, p 234 (Deady & Lane 1843-1872); Oaks, 32 U Chi L Rev at 253.[8]

---

[7]  The Judiciary Act of 1789 does not use either the "in behalf of" or "on behalf of" language used in England and early colonial states. However, as we explain, because the court invoked and relied on common law concepts of habeas corpus, including the "in behalf of" language, the case is instructive.

[8]  After Oregon enacted its habeas corpus law, in 1948, Congress amended federal law and added language similar to that in ORS 34.340, allowing for an application for a writ of habeas corpus to be filed "by the person for whose relief it

We see no basis to depart from how habeas corpus has been understood since its early origins. As described above, it has long been understood that a stranger, who receives no authority of the person in whose behalf they bring the petition and demonstrates no relationship with the imprisoned individual, has no right to bring a habeas action "in behalf" of that person. Absent any indication that the Oregon Legislative Assembly intended otherwise—and we see no such indication—we decline to adopt plaintiff's suggestion that ORS 34.340 permits "any human being" to petition for a writ of habeas corpus on behalf of an individual. Instead, we construe ORS 34.340 in accordance with its extensive history, which has required some sort of relationship with or authority from the individual on whose behalf the writ is sought.[9]

In this case, we do not need to define precisely what constitutes "enough" of a relationship between a petitioner and the individual on whose behalf the petition is brought or what form of authorization must be shown, because here, plaintiff has not demonstrated *any* relationship, authority, or consent from the patients. Instead, plaintiff provided a summary of his credentials, asserting that, from them, one can infer "that he knows quite a bit about the kinds of people being restrained at the hospital and the process by which such people are restrained and treated," and offered that he has "volunteered to bring this proceeding on behalf

is intended or *by someone acting in his behalf.*" 28 USC § 2242 (1982 ed) (emphasis added). The revisers noted that the change "follow[ed] the actual practice of the courts." Revisers' Notes to 28 USC § 2242 (1982 ed). At the federal level, that practice is colloquially known as the "next friend doctrine." "Next-friend" standing generally requires a third party, who acts as the "next friend" in a habeas corpus application, to show a significant relationship to the affected individual and that individual is unable to proceed in his or her own behalf. *Whitmore*, 495 US at 163-64. In describing the origin of the next friend doctrine, the Supreme Court cited the 1679 Habeas Corpus Act's "any one on *** behalf of" text, as well as the House of Lords' resolution in 1704 that habeas corpus authority may be invoked by the prisoner, as well as "his agents or friends." *Id.* at 162.

[9] Understanding the statute in that manner also makes practical sense, particularly in this context. Were we to adopt plaintiff's broad construction of the statute—allowing any person, even one with no relationship with or consent from a party—to file a petition for writ of habeas corpus, patients' federally protected health information could be revealed to the petitioner, who is no more than a stranger. Indeed, before concluding that plaintiff here had no standing, the trial court allowed plaintiff access to the protected health information of the five patients.

of these * * * patients." Under those circumstances, plaintiff lacks standing in this case. Because he lacks standing, this case does not meet the requirements of ORS 14.175 and we dismiss the appeal as moot.[10] ORS 14.175(1) (to qualify for review of an otherwise moot case, the plaintiff must have had standing to bring the case in the first instance).

Appeal dismissed as moot.

---

[10] Plaintiff has not suggested any other source of authority, outside of ORS 14.175, that would authorize us to review an otherwise moot case. Moreover, because we have concluded that plaintiff lacks standing, we would not reach the merits of his claim even if we were to conclude that, independent of ORS 14.175, we should exercise authority to review this case notwithstanding its mootness. *See Couey*, 357 Or at 520 ("[T]here is no basis for concluding that the court lacks judicial power to hear public actions or cases that involve matters of public interest that might otherwise have been considered nonjusticiable under prior case law.").